# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

McMILLEN ENGINEERING, INC.,      )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )          2:07cv1084
                                 )          Electronic Filing
                                 )
THE TRAVELERS INDEMNITY          )
COMPANY, as successor in interest to )
GULF INSURANCE COMPANY, and      )
NAVIGATORS INSURANCE             )
COMPANY                          )
                                 )
            Defendants.          )

## OPINION

McMillen Engineering, Inc., ("plaintiff") commenced this action seeking a determination as to which of the two defendants, Travelers Indemnity Company ("Travelers") or Navigators Insurance Company ("Navigators") has an obligation to provide coverage for a demand for payment arising from a slippage of lateral ground support on a site where plaintiff provided engineering services. Presently before the court are defendants' motions for summary judgment. For the reasons set forth below, the motions will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party

bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be

granted. <u>Anderson</u>, 477 U.S. at 249-50; <u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of North</u> <u>America</u>, 974 F.2d 1358, 1362 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. On June 21, 2001, plaintiff entered into a contract for professional services with the Redevelopment Authority of the County of Fayette ("RACF") to provide general engineering services for a multi-phased construction project to be conducted on property owned by RACF. Under Phase I, plaintiff was to prepare storm water retention plans and specifications, complete and document a geotechnical investigation, and prepare specifications for earth fill or removal. Plaintiff entered into a contract on February 3, 2003 to provide all necessary engineering services for Phase II of the project. Plaintiff was responsible for preparing final designs and specifications, including grading and excavation plans and details. Plaintiff's storm water retention plans required grading of a slope on the property. The slope is located downhill from and south of State Route 40, a public thoroughfare owned and maintained by the Pennsylvania Department of Transportation ("PennDOT").

The 2001 and 2003 contracts required plaintiff to provide geotechnical services for both phases of the project. Plaintiff subcontracted with Benatec Associates, Inc. ("Benatec") to perform the geotechnical services portion of the contract. In September of 2001, Scott Bush, a Benatec employee, prepared and submitted a subsurface geotechnical investigation report. The report stated the subsurface material on the RACF property was suitable to establish the storm water detention basin and the other infrastructure to be installed. Penn Development was hired

3

to perform the excavation.

Prior to preparing the excavation plans for the slope, plaintiff followed the Pennsylvania One Call Procedure.[1]  Verizon failed to notify plaintiff of its easement on the property in which underground lines were located.  Penn Development also followed the Pennsylvania One Call Procedure prior to beginning any excavation work and Verizon failed to notify it of the easement as well.  Unaware of the Verizon easement, plaintiff completed its grading and excavation plans.

The existence of Verizon's easement was discovered when Penn Development cleared the slope in preparation to begin its excavation work.  Due to the location of the easement, plaintiff had to modify its original excavation plans.  Penn Development then performed and completed the excavation work on the slope.

On December 30, 2003, plaintiff was notified of a failure on the slope (the "Slide"). Plaintiff immediately authorized Penn Development to perform emergency work on the slope and notified RACF about the Slide on December 31, 2003.

On February 5, 2004, PennDOT met with plaintiff, RACF, and Penn Development regarding the Slide.  At the meeting, PennDOT expressed concerns about safety conditions at the site.  Specifically, PennDOT was concerned that the excavation work had jeopardized the horizontal and lateral support of  Route 40.  PennDOT's position was that RACF, as the adjacent landowner, should pay for the required repair work.  RACF did not take a position as to what caused the Slide, other than emphasizing to PennDOT that it was not responsible for

---

[1] Pursuant to 73 P.S. §§ 176, et seq., persons covered by the statute, like excavators or designers, are required to call facility owners and notify them of their intent to perform excavation, demolition, or similar work.

4

the Slide or any resulting damage to Route 40.  It did not agree to absorb any remediation

costs.  Following the February 5, 2004 meeting and pursuant to RACF's request, plaintiff

worked with a PennDOT engineer to develop restoration plans.

   On February 11, 2004, PennDOT sent a letter to RACF regarding the Slide.  It

essentially explained the recourse available to PennDOT under 36 P.S. § 670-419, a

Pennsylvania statute which imposes a duty on adjacent landowners to provide vertical and

lateral support to state highways.  The letter put RACF, plaintiff and Penn Development on

notice that PennDOT considered all three entities responsible for the Slide.  It directed RACF

to perform promptly any work necessary to stabilize and maintain the Slide, monitor it and

develop plans for permanent restoration.  It further informed RACF that if it failed to comply

with these directives, PennDOT would have an outside contractor perform the work and bill

RACF for it.  RACF, plaintiff and Penn Development were advised that failure to comply with

these directives could result in their actions being deemed a public nuisance.  The letter

concluded by alerting RACF that it could be exposed to liability should any accident occur on

Route 40.  It is undisputed that the February 11, 2004 PennDOT letter did not contain any

allegations of negligence on the part of any entity involved, including plaintiff.

   RACF forwarded the February 11, 2004 letter to plaintiff and directed it to perform the

stabilization work and monitoring demanded by PennDOT.  RACF requested that plaintiff

conduct an investigation into what caused the Slide, design plans for permanent restoration and

determine the cost of that remediation.  There was no discussion at that time regarding

compensation for the restoration work.  After plaintiff developed the remediation plans it

submitted an invoice to RACF for its work.  Payment was not approved because there had been

no prior agreement about payment for plaintiff's work in developing the remediation plans. There was, however, a discussion regarding the possibility of future payment for the unpaid invoice.

By March of 2004, general discussions had taken place between plaintiff and RACF as to what caused the Slide. Several theories had been proposed regarding possible causes, including "Verizon, PennDOT, God." Deposition of RACF's Executive Director Andrew French (Doc. No. 67-7) at 43.[2] Throughout this period of time there was no allegation that plaintiff's negligence caused the Slide.

On July 22, 2004, plaintiff submitted an application for insurance with Travelers. It did not disclose any information concerning the Slide. Travelers subsequently issued a claims-made architects and engineers professional liability insurance policy, with a policy period effective from September 22, 2004 to September 22, 2005.

In November of 2004, RACF received a letter from Verizon alleging that RACF was liable for the cost of repairs to Verizon's underground lines, which Verizon asserted had been damaged by the Slide. During the time that plaintiff applied for and obtained the Travelers policy, it continued to perform the services requested by RACF. Plaintiff did not perform any remediation work other than to design the restoration plans and determine the cost of repair.

On January 28, 2005, plaintiff provided RACF with an overview of its investigation into the cause of the Slide. Water had infiltrated Verizon's existing utility trench on the site due to poor compaction of the trench. The Verizon trench functioned as a migration pathway

---

[2] Raymond Polaski was RACF's executive director until 2005, when Andrew French succeeded him.

for surface water runoff, which in turn caused the saturation of the slope. The saturation weakened the soil to the point where it became unstable, resulting in the Slide. Plaintiff's January 28, 2005 Letter (Doc. No. 67-5). Verizon had adjusted the height of a manhole cover on the slope and failed to re-pack the soil properly. This led to the trench acting as a migration pathway and the manhole cover at the end of the trench acting as a plug, which in combination caused the saturation.[3] RACF did not question plaintiff's determination in January of 2005 and has never had any reason to question plaintiff's ultimate determination as to the cause of the Slide. Testimony of Raymond Polaski (Doc. No. 77-2) at 20.

Plaintiff submitted three proposals to RACF that it had received from contractors interested in performing the remediation. RACF received the proposals in February of 2005 and declined to enter into a contract with any of the contractors.

On April 13, 2005, at a meeting between PennDOT, RACF, and plaintiff, RACF informed PennDOT of its decision not to contract for the repair work. RACF again took no position as to what caused the Slide other than to state that it was not responsible for any damage to Route 40. PennDOT reiterated its position that if RACF, as the adjacent landowner, did not perform the work, PennDOT would have the remediation work performed and submit a bill to RACF. Neither PennDOT nor RACF indicated they would seek reimbursement from plaintiff for these costs.

On April 21, 2005, plaintiff received written notice from PennDOT that it had hired a contractor to perform the remediation work at an estimated cost of $290,000.00. PennDOT's

_____

[3] Plaintiff's January 28, 2005, letter did not reference the role of the manhole cover in causing the saturation of the slope.

contractor completed the work in June of 2005.

On July 7, 2005, plaintiff was advised by its insurance agent that Travelers would not continue to provide coverage after its policy expired on September 22, 2005. Consequently, on July 25, 2005, plaintiff submitted an application for insurance for a claims-made architects and engineers professional liability insurance policy with Navigators. The Navigators policy was to take effect on September 22, 2005 and expire on September 22, 2006. Plaintiff subsequently revised its application on September 19, 2005.

On September 20, 2005, two days before the Travelers policy was set to expire, plaintiff was served with a complaint filed by Verizon. The Verizon complaint alleged that both plaintiff and Penn Development were responsible for the cost of repairing Verizon's underground lines, which Verizon asserted were damaged as a result of the Slide. It further alleged that the damage to the lines had been caused by, *inter alia*, plaintiff's negligence and carelessness. It is undisputed that the Verizon complaint was the first time an allegation of negligence had been made against plaintiff. The next day, plaintiff revised its application with Navigators for the second time. It did not disclose any information about the Verizon complaint. On September 22, 2005, the Travelers policy expired and the Navigators policy took effect.

PennDOT sent a letter to RACF dated August 18, 2005 requesting reimbursement for the cost it incurred in repairing the damage caused to Route 40. Enclosed was an invoice for $304, 964.94. On October 3, 2005, RACF forwarded PennDOT's August 18, 2005 letter and invoice to plaintiff along with a letter which reiterated RACF's position that it was not responsible for the Slide. RACF's letter announced that the costs associated with the repairs

should be the responsibility of either plaintiff or its sub-contractors.  Despite seeking payment from plaintiff, the letter did not allege that plaintiff caused the Slide or was negligent in any way.

Upon receiving RACF's letter, plaintiff  notified both defendants of RACF's demand. Both defendants denied coverage and plaintiff filed this declaratory judgment action in the Court of Common Pleas of Fayette County, which defendants removed.  It remains undisputed that neither PennDOT nor RACF have made any allegations of negligence against plaintiff to date.

Travelers contends it is entitled to summary judgment because no claim was made against plaintiff during the period of coverage provided by its policy.  To the extent a demand for services or payment by PennDOT or RACF is construed to constitute a claim, such a demand originated in February of 2004, would be part of a single claim under the policy, and thus was first made prior to the period of coverage.  Finally, plaintiff knew of the demand in February of 2004, and cannot satisfy the grant of coverage requirement of proving that on the application date of July 22, 2004 it did not know and could not reasonably expect that a claim would be made against it.

Navigators contends it is entitled to summary judgment because the Slide and PennDOT/RACF's demands for services were known to plaintiff on the date its policy became effective and therefore those demands are outside the grant of coverage.  Plaintiff failed to disclose the circumstances surrounding the Slide and the Verizon suit on its revised application and any claim arising out of the same circumstances is excluded under its policy.  Finally, the October 3, 2005 demand for payment by PennDOT/RACF arises from the same series of acts

9

or omissions as the Verizon complaint and thus constitutes part of a single claim that was first made before its policy took effect.

Plaintiff contends that the October 3, 2005 demand for payment constitutes the first claim made against it and therefore coverage is available under the Navigators policy. Alternatively, the Verizon suit provided the first notice of a potential claim. That potential claim ripened into an actual claim upon receipt of the October 3, 2005 demand. Coverage is therefore provided under the Travelers policy because the first notice of the claim occurred during its policy period. Plaintiff further asserts that at the very least, there are material issues of fact as to whether any communication received prior to October 3, 2005 constituted a claim under either policy.

The applicable law and undisputed facts demonstrate as a matter of law that no claim has ever been made by PennDOT or RACF as defined by either policy. Consequently, defendants are entitled to a declaration that they are not obligated to provide coverage for the PennDOT/RACF demands as an actual claim.

Pennsylvania's rules of insurance contract interpretation are well established. <u>401 Fourth Street, Inc. v. Investors Insurance Group</u>, 879 A.2d 166, 171 (Pa. 2005). Interpretation of an insurance contract generally is a task to be performed by the court rather than a jury. <u>Id.</u> (citing <u>Madison Construction Co. v. Harleysville Mutual Ins. Co.</u>, 735 A.2d 100, 106 (Pa. 1990) and <u>Standard Venetian Blind Co. v. American Empire Ins. Co.</u>, 469 A.2d 563, 566 (Pa. 1983)). This general rule is derived from the approach followed in all areas of contract law. <u>See</u> <u>Gonzalez v. U.S. Steel Corp.</u>, 398 A.2d 1378, 1385 (Pa. 1979) ("For a variety of reasons the common law has long thought it best to leave to the court than rather to the jury the

essential factual question of what the contracting parties intended.") (quoting <u>Community College of Beaver County v. Society of the Faculty</u>, 375 A.2d 1267, 1275 (Pa. 1977)). Adherence to this approach "contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike." <u>Id.</u> (quoting Restatement (Second) of Contracts § 283, Comment d). In contrast, "a question of interpretation of an integrated agreement is to be determined by a trier of fact if it depends on the credibility of extrinsic evidence or on a choice of reasonable inferences to be drawn from extrinsic evidence." <u>Id.</u> (citing Restatement (Second) of Contracts § 238(a)); <u>see</u> <u>also</u> <u>Ram Construction Co., Inc., v. American States Ins. Co.</u>, 749 F.2d 1049, 1052 (3d Cir. 1984) (same)).

"The purpose of [interpreting an insurance contract] is to ascertain the intent of the parties as manifest by the terms used in the written insurance policy." <u>401 Fourth Street, Inc.</u>, 879 A.2d at 171 (citing <u>Gene & Harvey Builders Inc. v. Pennsylvania Manufacturers' Association Ins. Co.</u>, 517 A.2d 910, 913 (Pa. 1986)). "When the language of the policy is clear and unambiguous, the court is required to give effect to that language." <u>Id.</u> In contrast, when the language in question is ambiguous, a construction which favors the contract's primary purpose of providing the insured with indemnification is to be favored. <u>Id.</u>

Where the intent of the parties cannot definitively be discerned from the language of the agreement, the potential for ambiguity arises. "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" <u>401 Fourth Street, Inc.</u>, 879 A.2d at 171. The inquiry is not to be conducted in a vacuum. <u>Madison Construction Co.</u>, 735 A.2d at 106. Instead, contractual terms will be

recognized as ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." Id. However, it is improper to "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." Id. (citing Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 1982)).

The polestar of the court's inquiry is the language of the insurance policy. Several rules of interpretation come into play when a court is called upon to ascertain the intent of the parties as reflected in the insurance contract. First, in examining such language to determine what the parties intended, "the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." 401 Fourth Street, Inc., 879 A.2d 171 (quoting Steuart, 444 A.2d at 662). And in doing so the court is not to "consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties." Id.

Second, when words of common usage are used in an insurance policy, they are to be construed in their natural, plain and ordinary sense. Madison Construction Co., 735 A.2d at 108 (citing Easton v. Washington County Ins. Co., 137 A.2d 332, 335 (Pa. 1957) and Blue Anchor Overall Co. v. Pennsylvania Lumbermans Mutual Ins. Co., 123 A.2d 413, 415 (Pa. 1956)). Furthermore, where terms commonly used in insurance policies have acquired settled meanings, a new meaning cannot be ascribed to any such term absent express language in the policy indicating such a change was intended. Farber v. Perkiomen Mutual Ins. Co., 88 A.2d 776, 779 (Pa. 1952). To do so would run afoul of the constitutional prohibition against impairment of contracts. Id.

The insured has the burden of proving that its claim falls "within the policy's

12

affirmative grant of coverage." <u>Koppers Co., Inc. v. Aetna Cas. & Sur. Co.</u>, 98 F.3d 1440, 1446 (3d Cir. 1996). In contrast, the insurer carries "the burden of proving the applicability of any exclusions or limitations on coverage." <u>Id.</u> Exclusions are strictly construed against the insurer. <u>Standard Venetian Blind Co.</u>, 469 A.2d at 566. Exclusions will be effective if they are "clearly worded" and "conspicuously displayed." <u>Id.</u> at 567.

Both insurance policies at issue are "claims-made" policies. A claims-made policy differs from an "occurrence" policy in that a claims-made policy provides coverage for the insured only for claims first asserted against the insured during the policy period. <u>Township of Center v. First Mercury Syndicate, Inc.</u>, 117 F.3d 115, 118 (3d. Cir. 1997). A claims-made policy provides coverage for a wrongful act regardless of when it took place, as long as a claim is made against the insured during the period of coverage. <u>Id.</u>

The policies contain virtually identical definitions of what constitutes a "claim." The Travelers policy defines a claim as:

> [a] [d]emand for money or services, naming YOU and alleging a negligent act, negligent error or omission negligently committed in performance of YOUR PROFESSIONAL SERVICES on behalf of the Named Insured for others by YOU or any entity, including joint ventures, for whom YOU are legally liable.

Travelers Policy (Doc. No. 67-14) at 1. The Navigators policy defines a claim as:

> [a ] [d]emand for money or services, naming YOU and alleging a negligent act, negligent error or omission resulting from and negligently committed in performance of YOUR PROFESSIONAL SERVICES on behalf of the Named Insured for others by YOU or any entity, including joint ventures, for whom YOU are legally liable.

Navigators Policy (Doc. No. 63-5) at 6.

According to the plain language of both policies, in order to constitute a claim, there

must be (1) a demand for services or payment and (2) an allegation of negligence. Both policies offer a clear definition of a claim, which in turn renders the defined term incapable of "being understood in more than one sense." See Madison Constr. Co., 735 A.2d at 106. Pursuant to the rules of interpretation, because the policy language is clear and unambiguous, the term must be given full effect. See Standard Venetian Blind Co., 469 A.2d at 566.

PennDOT/RACF's February of 2004 demands for services and PennDOT/RACF's October of 2005 demands for money do not constitute a "claim" because none of them were accompanied by an allegation of negligence.

Any attempt to label PennDOT's February 2004 letter and RACF's related communications to plaintiff as a claim is misguided. It is clear that the purpose of the letter was to alert RACF, its engineers and its contractors that the Slide had affected the horizontal and lateral support of Route 40 and direct them to take immediate action to resolve the situation. It notified RACF that PennDOT believed it was responsible for any costs as an adjacent landowner, which by implication provided notice of its potential exposure to liability under 36 P.S. § 670-419, a Pennsylvania State Highway statute which holds adjacent landowners strictly liable for any activity that removes vertical or lateral support. It also notified all entities of their potential exposure to liability for creating a public nuisance. Neither of these avenues for recouping costs depend upon or involve a showing of negligence.

The relevant portion of the first half of PennDOT's February 11, 2004 letter stated the following:

> It has come to our attention that excavation at the approximate location referenced above has been conducted on your [RACF's] property. This excavation has created a slide condition that is causing cracks in our roadway. A

14

meeting was held at the site with [plaintiff] and your contractor to address the immediate safety concerns.

Two problems still exist: first your contractor has affected the lateral and horizontal support of the roadway and second, the slides are putting our construction project and its funding in jeopardy.

I am giving you notice that you, your engineer, and your contractor are responsible for all damages to our roadways that result from your removal of the lateral and horizontal support. These slides need to be repaired promptly.

PennDOT's February 11, 2004 Letter (Doc. No. 77-8) at 1-2.

The only statement PennDOT made with regard to plaintiff was that it was responsible for all damages that resulted from RACF's removal of lateral and horizontal support of the roadway. It did not make any allegation that plaintiff negligently affected or removed the support owed to PennDOT or that the Slide was the result of any act, error, or omission negligently committed by plaintiff. PennDOT's primary concern was to resolve the matter expeditiously due to safety concerns and put RACF on notice that it considered everyone involved responsible for all necessary remediation measures.

Being financially responsible for a situation does not necessitate an initial finding of negligence. Such an obligation can arise in a number of ways. Put another way, simply because one is considered responsible for something does not mean that his or her responsibility was brought about due to negligence or wrongdoing. This is highlighted by the fact that PennDOT told RACF that it considered RACF responsible merely because RACF was the landowner. As the court observed in Bensalem Township v. Western World Ins. Co., putting someone on "notice that it is [their] intention to hold the insureds responsible for a 'Wrongful Act' is an event commonly antecedent to and *different in kind from* a 'claim'." 609 F. Supp. 1343, 1348 (E.D. Pa. 1985). Even more persuasive is the fact that PennDOT's letter

merely stated that it was holding everyone involved responsible and never alleged that the

Slide was brought about by any wrongful or negligent act.

The relevant portions of the second half of the letter state the following:

> Pursuant to this letter, you are directed to perform any work necessary to stabilize and maintain the slide . . . . Additionally, you are directed to begin preparation of plans to fully restore the road to its presubsidenced condition.
> Following a review and approval of these plans . . . you shall immediately begin the complete restoration work. The full restoration work must be completed in an expeditious manner.
> Should you fail to comply with any of the above items by the date specified, your actions will be deemed to be a public nuisance as provided by state law and the Department may have the work performed by an outside contractor and bill you for it or the Department may have a court require you to perform the work.

The warning that failure to perform the requested services would be treated as a public

nuisance likewise cannot reasonably be construed as an allegation that a claim of negligence was

being contemplated. In Pennsylvania, "the term 'nuisance' is applied to that class of wrongs that

arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real

or personal, or from his own improper, indecent, or unlawful personal conduct, working on [sic]

obstruction or injury to a right of another, or of the public, and producing such material

annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage."

Groff v. Borough of Sellersville, 314 A.2d 328, 330 (Pa. Commw. Ct. 1974) (quoting Kramer v.

Pittsburgh Coal Company, 19 A.2d 362, 363 (Pa. 1941)); accord Philadelphia Electric Co. v.

Hercules, Inc., 762 F.2d 303, 313 (3d Cir. 1985) (citing Restatement (Second) of Torts § 821D)

(A "private nuisance" is "a nontrespassory invasion of another's interest in the private use and

enjoyment of land." ). A public nuisance is an inconvenience or troublesome offense that annoys

a whole community in general, and not merely some particular person. Feeley v. Borough of

Ridley Park, 551 A.2d 373, 375 (Pa. Commw. Ct. 1988).  Circumstances that constitute a public

nuisance are, among other things, conduct that is proscribed by statute or ordinance or conduct

that interferes with the public peace, or poses a significant threat to public health.

Commonwealth v. Ebaugh, 783 A.2d 846, 850 (Pa. Commw. Ct. 2001).  Neither type of

nuisance liability requires a finding of negligence.

 Moreover, the Pennsylvania State Highway statute proscribes activity that causes the

failure of vertical or lateral support.  The statute provides:

> Whenever a State highway, or any part thereof, subsides by reason of the failure
> of vertical or lateral support therefore, it shall be the duty of the person,
> copartnership, association or corporation then owning the subjacent or adjacent
> strata ... to provide for the restoration of the vertical and lateral support, and the
> replacement of the surface of such highway, upon receiving from the department
> notice to proceed with such restoration and replacement. In the event that such
> owner of the subjacent or adjacent strata does not proceed, immediately after
> notice, with the replacement and restoration of the highway, and does not
> diligently complete such restoration and replacement within a reasonable time, the
> subsidence *is hereby constituted and declared a public nuisance* which may be
> abated by appropriate proceedings, in law or in equity, against such owner. If such
> owner fails or refuses to provide for the restoration and replacement of the
> highway, then the department may proceed with such restoration and replacement,
> and the underlying owners of the subjacent or adjacent strata, both at the time the
> vertical or lateral support was removed and at the time the subsidence occurred,
> and their respective assignees, lessees or grantees shall be jointly and severally
> liable for the cost of restoration.

36 P.S. § 670-419 (emphasis added).  Thus, the failure to restore lost vertical or lateral

support for a state highway in a timely manner is deemed to be a public nuisance.

 To be liable under Section 419, PennDOT must prove that (1) the defendant was

the owner of the subjacent or adjacent strata of the area of the subsidence or the grantee

of such ownership interest and (2) the subsidence was caused by failure of the vertical or

lateral support in the subjacent or adjacent strata.  Commonwealth, Dept. of Transp. v.

UTP Corp., 847 A.2d 801, 804 (Pa. Commw. Ct. 2004). The statute does not impose any *mens rea* requirement that the adjacent landowner willfully, knowingly, or intentionally breach that duty. Nor does it require any showing of negligent or reckless conduct. It simply makes adjacent landowners strictly liable for failure to provide such support. Thus, a finding of negligence is not implicated by PennDOT's threat to institute a public nuisance action should RACF, its engineer and its contractors fail to take prompt remedial measures.

Similarly, the October 3, 2005 letter from RACF to plaintiff does not qualify as a "claim" because allegations of negligence were also absent. The purpose of that correspondence was for RACF to reiterate its position that it would not assume financial responsibility for the remediation costs. The letter states in relevant part:

> Attached is a copy of an invoice from [PennDOT] for repair of slide conditions along Route 40 adjacent to the Fayette County Business Park.
> Per our previous conversations, [RACF] believes that costs associated to these repairs should be the responsibility of either the contractor, your company (McMillen Engineering), or your sub-contractors.

RACF October 3, 2005 Letter (Doc. No. 77-21) at 2. While the letter demanded payment for the PennDOT invoice, the demand was not premised on any belief that plaintiff should pay the costs because of a negligently committed act, error or omission on its part. The letter does not state that plaintiff should be responsible for payment because it had negligently created a condition that led to the Slide, nor does it use language that raises such an inference. RACF merely refused to foot the bill that PennDOT told RACF it would send in the event that PennDOT had to perform the restoration work through its own contractors. The fact that RACF passed the bill over to plaintiff in order to deflect

18

its own payment responsibility does not change the underlying basis for PennDOT to assert liability against RACF, plaintiff or its subcontractors.

Furthermore, an inference that RACF might pursue a claim for negligence against plaintiff cannot properly be drawn. Any duties plaintiff owed to RACF arose by contract. It is well-settled that where the duties between parties arise by contract, recourse for any breach is limited to redress in contract and resort to tort claims generally is not permitted.

Pennsylvania's "gist of the action doctrine" "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc. v. Ellias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002). "As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." Id.

In general, the difference between contract claims and tort claims depends upon the origin of the duties alleged to have been breached by the defendant's conduct. "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." Id. (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. 1992)).

To be sure, the two causes of action are not mutually exclusive. Id. To the contrary, it is quite "possible that breach of contract also gives rise to an actionable tort." Id. But "to be construed as in tort, however, the wrong ascribed to [the] defendant must be the gist of the action, the contract being collateral." Id. (quoting Bash, 106 A.2d at 829). "In other words, a claim should be limited to a contract claim when 'the parties'

19

obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'" Id. (quoting Bohler-Uddeholm Am., Inc., v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001), cert. denied, 534 U.S. 1162 (2002)).

Whether the gist of the action doctrine applies in any particular setting is a question of law. Id. In general, the courts have applied the gist of the action doctrine to bar tort claims in four separate settings where (1) the claims arise from a contract between the parties; (2) the duties allegedly breached were created and grounded in the contract itself; (3) the liability stems from a contract; or (4) a tort claim essentially duplicates a breach of contract claim or its success is wholly dependent on the terms of a contract. eToll, 811 A.2d at 20.

Here, RACF has never made an allegation of negligence against plaintiff. It has admitted that it has no reason to question plaintiff's determinations as to the cause of the Slide. It has never suggested in any manner that plaintiff breached a professional duty in the performance of the contracts. Consequently, any claim for recovery by RACF is grounded in contract law and there is no basis to assume or infer that a recovery could be based on any other duty.

Interestingly, plaintiff essentially concedes Travelers' main argument that no claim has ever been made during its policy period. Plaintiff contends that "[a]lthough [the October 3, 2005] demand did not allege a negligent act, it is [plaintiff's] position that [it] was the first date on which the PennDOT/RACF claim was made against it." Plaintiff's Brief in Opposition to Travelers Motion (Doc. No. 76) at 3. Similarly, plaintiff repeatedly argues that the PennDOT/RACF communications in February of 2004 did not constitute a claim because the

demand for services did not allege a negligent act.  See, e.g., id. at 7-8.  But allegations of

negligence also were absent in RACF's October 2005 letter to plaintiff.  Consequently, it is

clear and virtually undisputed that any communication to plaintiff by PennDOT or RACF

through October of 2005 cannot constitute a claim under either policy.

Each policy also provides coverage for potential claims that are timely reported.   The

applicable law and undisputed facts demonstrate as a matter of law that plaintiff failed to report

timely a potential claim to Travelers which precludes coverage for the October 3, 2005 RACF

demand or any future claim arising out of the same circumstances under the Travelers policy.

Similarly, plaintiff failed to disclose known facts and circumstances in its application to

Navigators which precludes coverage for the October 3, 2005 RACF demand or any future

claim arising out of the same circumstances under the Navigators policy.  Consequently, both

Travelers and Navigators are entitled to a declaration that they are not obligated to provide

coverage for any future claims that may arise from the same facts or circumstances

surrounding the Slide.

The Travelers policy provides coverage for a potential claim which is identified as a

"pre-claim circumstance."  A pre-claim circumstance is defined as:

> [a]n event, incident, allegation, circumstance, dispute or situation of which YOU
> first become aware during the POLICY PERIOD that a reasonably prudent person
> might expect to give rise to a CLAIM.

Travelers Policy (Doc. No. 67-14) at 2.

Under Pennsylvania law, determining the effect of phrases or clauses in an insurance

policy that turn on an assessment of the circumstances or information known to an insured at

any particular moment is based on a "mixed formulation."  Selko v. Home Ins. Co., 139 F.3d

146, 151 (3d Cir. 1998). First, the carrier has the burden of proving the facts or information

actually known to the insured. Id. at 152. Second, the import of the known predicate facts and

information must be measured by the application of an impersonal standard: what a reasonable

professional in the insured's field of expertise in possession of such facts and circumstances

would recognize, believe, understand and so forth. Id.; accord Coregis v. Baratta & Fenerty,

Ltd., 264 F.3d 302, 306 (3d Cir. 2001) (applying Selko two-part inquiry to an exclusion that

eliminated coverage for "acts, errors, or omissions occurring prior to the effective date of the

Policy if [the insured] knew or could have reasonably foreseen that they might be the basis of a

claim."); Home Ins. Co. v. Stegenga, No. 90-275 (W.D. Pa. July 3, 1991), aff'd, (3d Cir. Feb. 3,

1992) (As long as the insured is subjectively aware of facts that, under an objective "reasonable

person" standard would be seen as possibly giving rise to liability, he will not be covered for

liability resulting from those incidents) (cited with approval in Selko, 139 F.3d at 151). This

approach properly places the burden on the insurer to prove that any necessary underlying facts

actually were known to the insured. Selko, 139 F.3d at 152. It also balances the countervailing

interests of assuring that a professional is not made accountable for matters that were beyond

his or her ken and eliminating the ability to defeat the import of policy provisions based solely

on the assertion of subjective ignorance. Id

Plaintiff had knowledge of the PennDOT/RACF demand for services during the

duration of the Travelers policy period. It understood that RACF was unwilling to assume

financial responsibility for any remediation costs during this same time. It was well aware by

the April 2005 meeting that RACF was unwilling to enter into a contract for the remediation

work and therefore PennDOT would be hiring a contractor and billing RACF for the costs. It

22

received written notice on April 21, 2005 that PennDOT had authorized a contractor to perform the necessary remediation work at an estimated cost of $290,000.00.  It was served with the Verizon complaint on September 20, 2005, which was two days before the policy expired.  At that point it had notice of a demand for services and/or money arising out of the Slide and notice that a third party formally had asserted its negligence was a cause in bringing the Slide about.  All of the facts needed to constitute a pre-claim circumstance that a "reasonably prudent person might expect to give rise to a claim" had come to light.

In order to trigger coverage for a pre-claim circumstance, the insured must timely report the pre-claim circumstance as required under the terms of the policy.  Failure to comply with the reporting requirements precludes coverage.  Pizzini v. American International Specialty Lines Ins. Co., 210 F. Supp.2d 658, 668 (E.D. Pa. 2002).  This principle flows from the nature of  a claims-made policy, which "represents a distinct bargained-for exchange between insurer and insured.  An insurer obtains the benefit of a clear and certain cut-off date for coverage.  In return, the insured typically pays a lower premium." Id.  (citing Employers Reinsurance Corp. v. Sarris, 746 F. Supp. 560, 564 (E.D. Pa.1990)).  In light of this, courts have declined to extend the relaxed reporting requirements of Brakeman v. Potomac Ins. Co., 371 A.2d 193, 197-99 (Pa. 1977) to claims-made policies.  Id. at 669 (collecting cases in support).

The Travelers policy  provides:

1. The CLAIM  is first made during the POLICY PERIOD and is reported to US during the REPORTING PERIOD; or

2. The CLAIM is first made during any applicable EXTENDED REPORTING PERIOD and is reported to US during such EXTENDED REPORTING PERIOD.

23

a CLAIM is considered first made when:

1. YOU receive a notice of the CLAIM; or
2. YOU report a PRE-CLAIM CIRCUMSTANCE to US during the POLICY PERIOD and such later becomes an actual CLAIM.

Travelers Policy (Doc. No. 67-14) at 2-3. The policy period is defined as the "[p]eriod of time between the effective date shown in item #2 of the Declarations [September 22, 2004] and the date of termination, expiration, or cancellation, whichever occurs first." Id. at 2. The reporting period is defined as "[t]he period of time between the effective date shown in item #2 of the Declarations [September 22, 2005] and sixty days after the end of the policy period [November 21, 2005]." Id.

The Travelers policy draws a significant difference between the reporting requirements for an actual claim and a pre-claim circumstance. To receive coverage for an actual claim, the claim must have first been made during the policy period and reported during its reporting period, which encompasses an extra sixty days beyond the policy's expiration. An actual claim is considered first made when the insured receives notice of the claim. Therefore, so long as an actual claim has been made during the life of the policy period and reported within 60 days after that period expires, the claim is covered.

In contrast, the reporting requirement for a pre-claim circumstance is not afforded the additional 60 days allotted under the reporting period. A pre-claim circumstance that later evolves into an actual claim is covered only when the insured reports the pre-claim circumstance during the *policy period*. Failure to report the potential claim during the life of the policy bars coverage for that circumstance should it later materialize into an actual claim. Consequently, an actual claim that is reported after the policy period but prior to the expiration of the reporting period will receive coverage, whereas a pre-claim circumstance that is reported after the policy period but prior to the expiration of the reporting period is not covered.

Unlike an occurrence policy, the reporting restrictions on claims and pre-claim

24

circumstances serve a vital function in a claims-made policy. They define the scope of coverage and provide certainty to the risks which the carrier has agreed to underwrite. City of Harrisburg, 596 F. Supp. 954, 961 (M.D. Pa. 1984). "In return for this certainty, an insured pays a lesser premium . . . and receives broader coverage than under an occurrence policy because conduct occurring before the policy term is covered." Id. (citations omitted).

Plaintiff notified Travelers of RACF's demand for payment of the remediation costs promptly after receiving RACF's October 3, 2005 letter. As previously established, this demand did not constitute a claim due to the absence of any allegation of negligence. Given plaintiff's knowledge at that point in time, it is properly characterized as a pre-claim circumstance -- an event, incident, allegation, circumstance, dispute or situation that could reasonably be expected to give rise to a claim. Travelers did not receive notice until sometime in October of 2005 and thus the pre-claim circumstance was not timely reported. "Although a harsh consequence," it follows that Travelers is entitled to a declaration that it has no future obligations as to any actual claim that may arise out of the Slide. Compare Pizzini, 210 F. Supp.2d at 668-70 (enforcing plain language of reporting requirements under claims-made policy notwithstanding the failure to show prejudice). To do otherwise would be "tantamount to an extension of coverage to the insured gratis, something for which the insurer has not bargained." City of Harrisburg, 596 F. Supp. at 961 (quoting Gulf Insurance Co. v. Dolan, Fertig and Curtis, 433 So.2d 512, 515-16 (Fla.1983)).

Navigators also is not under any obligation to provide coverage for a claim should one later arise from the RACF demand. Plaintiff's failure to disclose the circumstances surrounding the prior PennDOT/RACF demands for services and the Verizon complaint at the

time coverage was bound bars the ability to seek relief for any future claim under the Navigator's policy.

Plaintiff completed an application that asked whether it was "aware of any facts, circumstances, incidents, situations, or accidents (including, but not limited to: faulty or defective . . . product failure, construction dispute . . .) that may give rise to a claim, whether valid or not, which might directly or indirectly involve [you]?" Application to Navigators Policy (Doc. No. 63-5) at 23 (question 31). Plaintiff did not disclose the prior PennDOT/RACF demands when it completed the application for the first time on July 25, 2005, or when it made revisions to it on September 19, 2005. It did not disclose the Verizon suit when it revised its application for the second time on September 21, 2005. Coverage was bound on September 22, 2005.

The application further provided:

> IT IS UNDERSTOOD AND AGREED THAT IF ANY SUCH CLAIMS EXIST, OR ANY SUCH FACTS OR CIRCUMSTANCE EXIST WHICH COULD GIVE RISE TO A CLAIM, THEN THOSE CLAIMS AND ANY OTHER CLAIM ARISING FROM SUCH FACTS OR CIRCUMSTANCES ARE EXCLUDED FROM THE PROPOSED INSURANCE.

Id. The application was incorporated into the policy. Navigators Policy (Doc. No. 63-5) at 1. Similarly, the Navigators policy contains the following exclusion:

A. This insurance does not apply to and WE will not defend any CLAIM or pay any amounts under this policy for any CLAIM or any CLAIM EXPENSES arising out of:

* * *

6. Any liability for any CLAIM that arises out of or is related to YOUR PROFESSIONAL SERVICES where, before the effective date of the first policy issued by US and continually renewed by US, YOU were aware or reasonably should have been aware of

the CLAIM or were aware or reasonably should have been aware of an event, incident, allegation, circumstance, dispute or situation that has given rise or could reasonably be expected to give rise to such CLAIM against YOU.

Navigators Policy (Doc. No. 63-5) at 8.

As previously noted, on the dates plaintiff submitted and revised its application it had knowledge of the PennDOT/RACF demands for services and it understood that RACF was unwilling to assume financial responsibility for any remediation costs. It also noted in its January 28, 2005, causation letter that the Slide was exacerbated by the weather conditions in January of 2005, causing a break in Verizon's underground lines, a slip of the shoulder along Route 40, the rupturing of cast iron water lines owned by PA American Water, which then were replaced by polyethylene pipe, and an actual dip in Route 40. Plaintiff's January 28, 2005 Letter (Doc. No. 67-5) at 4. It was well aware by April of 2005 that RACF was unwilling to enter into a contract for the remediation work and therefore PennDOT would be hiring a contractor and billing RACF for the costs. It received written notice later that month that PennDOT had hired a contractor to complete the restoration at an estimated cost of $290,000.00. It was served with the Verizon complaint on September 20, 2005, the day before it revised its application for the second time and two days before it directed its agent to bind coverage. At that point it had notice of a demand for services arising out of the Slide and notice that a third party had asserted its negligence was a cause in bringing the Slide about. It was aware that the Slide had caused damage to another utility company's underground lines and that its impact on Route 40 was significant.

The above provisions of the application (which forms part of the parties' contract) and the policy do not require plaintiff to recognize or believe that it was negligent in the performance of its professional services. They merely require that a reasonable person and/or a reasonable professional engineer recognize or believe that a set of circumstances or a situation exist in which a third party may or reasonably could be expected to demand money or services

and make an assertion that plaintiff was negligent. The application precludes coverage where plaintiff knew of circumstances that may give rise to a claim. The Policy excludes coverage where plaintiff was aware of circumstances or a situation that reasonably could be expected to give rise to a claim.

All of the facts needed to cause a reasonable engineer to recognize that the circumstances surrounding the Slide presented a situation that may give rise to claim were known to plaintiff by September 20, 2005. Verizon had already made a claim against it as defined by the policy. The fact that plaintiff chose not to seek coverage for that claim did not cause that claim to undergo a metamorphosis. It was aware that the Slide had caused extensive damage to the support of Route 40 and the property of two third-parties. One of those parties had asserted a claim of negligence against it for those damages. All of these events had arisen out of the same circumstances. Given plaintiff's knowledge of the above facts and circumstances, a reasonable engineer would understand that an event, incident, or situation existed that may give rise to a claim and reasonably could be expected to give rise to a claim.[4] Consequently, its failure to disclose the Verizon complaint and circumstances surrounding the Slide on September 21, 2005, bars coverage for any future claim by operation of both the

---

[4] Plaintiff's argument that it had no reason to know of the exclusion upon which Navigators relies because it had not yet received the Navigators policy at the time it finalized the Navigators application is unavailing. The application clearly placed an affirmative obligation on plaintiff to identify the circumstances surrounding the Slide and the Verizon complaint. The exclusion merely augmented that requirement. Had plaintiff made disclosure it could have sought to purchase coverage for any subsequent claim filed against it during the duration of the Navigators policy. The failure to do so places any non-disclosed "claim" or "pre-claim circumstances" outside the coverage plaintiff chose to purchase.

application and exclusion 6.[5]


Date: September 30, 2010

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Ernest P. DeHaas, III, Esquire
        Radcliffe & DeHaas
        National City Bank Building
        Suite 700
        2 East Main Street
        Uniontown, PA 15401

        Alan S. Miller, Esquire
        Kelly A. Williams, Esquire
        Picadio, Sneath, Miller & Norton
        4710 U.S. Steel Tower
        600 Grant Street
        Pittsburgh, PA 15219

        Dennis A. Watson, Esquire
        Grogan Graffin, P.C.
        Four Gateway Center
        12th Floor
        Pittsburgh, PA 15222

---

[5] The Navigators policy provides that one or more claims arising from a series of related acts, errors or omissions will constitute a single claim and all such claims are deemed to be made during the policy period in which the earliest of such claims was first made. Navigators Policy (Doc. No. 63-5) at 9 (Limits of Insurance).